326 So.2d 538 (1976)
Mrs. Jennie Barksdale GILLASPIE
v.
Dr. and Mrs. Ernest J. MITTELBRONN.
No. 7234.
Court of Appeal of Louisiana, Fourth Circuit.
January 13, 1976.
Rehearings Denied February 10, 1976.
Writ Refused March 23, 1976.
*539 Tucker, Schonekas & Garrison, Gibson Tucker, Jr., and Arthur S. Mann, III, New Orleans, for defendant-appellee Mrs. Joan Rulis Mittelbronn.
Derbes & Derbes, Jorda S. Derbes, New Orleans, for plaintiff-appellant.
Dr. Ernest J. Mittelbronn, in pro per.
Before SAMUEL, LEMMON and SCHOTT, JJ.
SCHOTT, Judge.
Plaintiff is the mother of Dr. Mittelbronn, one of the defendants. Dr. and Mrs. Mittelbronn separated on February 6, 1973, and the separation and divorce proceedings have been pending between them since February 8, 1973. Plaintiff is claiming the sum of $31,704.49 as a debt of the community formerly existing between defendants and she seeks to be declared owner of a number of items of furniture and household wares in the possession of defendants.
Plaintiff's claim is based upon six cash loans to her son between July, 1968, and May, 1971, and a claim for $1,545.00 under three leases for rent of a garage and a portion of plaintiff's home allegedly used by defendants for storage.
In response to plaintiff's petition her son admitted all of her allegations except to claim a credit of $1,300.00, but Mrs. Mittelbronn denied her allegations and alleged that plaintiff's claim stems from a conspiracy between her and her son to cause a judgment to be rendered against the community of the Mittelbronns to her detriment.
The trial judge dismissed each one of plaintiff's monetary claims and with some few exceptions rejected plaintiff's claim to be declared owner of the various articles of furniture. From that judgment plaintiff has appealed.
At this point some reference should be made to the manner in which the trial of the case progressed. At the outset Mrs. Mittelbronn's counsel objected to the insufficiency of returns made by plaintiff and Dr. Mittelbronn to subpoenae duces tecum which had been served on them for documents and Mrs. Mittelbronn's counsel moved to continue the case. This motion was denied and plaintiff's case commenced. It consisted of the testimony of Dr. Mittelbronn and plaintiff as to each item with some documentation in corroboration. After the first day of trial, the judge dismissed the claim as to four of the alleged loans and the lease claims, but announced that he would "leave open" the other two alleged loans until further evidence was taken on these. On the first trial day the judge also passed on the claim of ownership of the furniture. When the case was resumed both sides got returns on subpoenae duces tecum for documents but because *540 the return by Dr. Mittelbronn was still insufficient the case was again only partially tried and continued until a third day. After some additional testimony was taken relative to the two claims still open these were likewise dismissed.
With respect to the five monetary items disposed of originally it is unnecessary for our purpose here to review the testimony in detail. It suffices to say that it was vague, equivocal, self-contradicting and contradictory as between plaintiff and her son.
On four alleged loans, no documentary evidence was introduced to corroborate the testimony other than some acknowledgments handwritten and signed by Dr. Mittelbronn purportedly on the dates when the loans were allegedly made. The weakness of plaintiff's case on these four items can be demonstrated by the following: Regarding an alleged loan of $1,797.66 on August 30, 1969, plaintiff testified in answer to a question as to how it came about and where it took place that she did not remember. As to an alleged loan of $5,475.00 on May 14, 1971, Dr. Mittelbronn was unable to recall the transaction. As to a loan of $1,000.00 on November 6, 1970, Dr. Mittelbronn had no recollection of the transaction while plaintiff was unable to explain an inconsistency between her testimony that she gave her son cash in this instance and the allegation in her petition which she signed to the effect that she had gotten a cashier's check for the $1,000.00. Dr. Mittelbronn testified several times that he got cash in these sizable transactions and placed it in a shoe box at home with his wife's knowledge, but Mrs. Mittelbronn denied this. Dr. Mittelbronn also testified that these loans were made to enable him to invest in real estate with his wife's full knowledge but she also denied this. These examples illustrate that the trial judge's apparent disbelief of plaintiff and Dr. Mittelbronn is supported by the record.
Similarly unconvincing testimony was given to show that the so-called leases were confected to permit Dr. Mittelbronn to store personal belongings in his mother's garage and home since May, 1968, although no rental payments were ever made under the leases. We find no error in the trial judge's conclusion "that it was never intended that these rental items would be collected . . . it is only natural that a mother would furnish storage space for the son. Quite true, the leases were drawn up, but in the opinion of the court, to be used only if necessary . . ."
On the claim of plaintiff to be recognized as the owner of items of furniture, a number of these are pieces which are being used by defendants' daughters in their own bedrooms, including beds, dressers and chairs. The court found that these items were gifts by the grandmother to the girls and declared the latter to be the owners of this furniture. With respect to all of the furniture there is hopeless contradiction between the testimony of plaintiff and that of Mrs. Mittelbronn, and the trial court's resolution of these conflicts will not be disturbed by this Court.
The other two alleged loans, one for $17,995.75 on May 6, 1969, and another for $2,431.74 on December 3, 1968, warrant closer scrutiny. Despite the fact that plaintiff produced some objective documentary evidence to support these claims the trial judge dismissed them at the conclusion of the trial. The larger of the two will be discussed hereafter in connection with plaintiff's motion to remand filed in this Court. As to the smaller one, we disagree with the trial court's conclusion.
Placed in evidence were two pass books for savings accounts at the Globe Homestead Association which were closed out on December 3, 1968. On both account books there are acknowledgments written and signed by Dr. Mittelbronn to the effect that he received these sums as loans and would repay his mother. In one case he promised to pay the amount involved and stated that "I will include you [plaintiff] *541 as a percentage partner in the acquisition of property and you will share percentage of profits as well." On the first day of the trial these books were introduced along with the testimony of plaintiff and Dr. Mittelbronn which was typically vague, equivocal and unconvincing. However, at the continued trial in response to a subpoenae duces tecum an official of the homestead produced two checks for the amounts which had been in the homestead, both dated December 3, 1968, to the order of plaintiff, endorsed by her and marked for deposit to the office account of Dr. Mittelbronn at the National American Bank of New Orleans, and showing that the checks were negotiated at that bank. Dr. Mittelbronn produced a check drawn by him on this account for $4,500.00 to the order of "Caltronics," and testified that the money borrowed from plaintiff was used to purchase Caltronics stock. This check was negotiated on December 9, 1968. Mrs. Mittelbronn's counsel made much over the fact that this check was dated October 30, 1968, and the contradiction between the acknowledgment written by Dr. Mittelbronn on the pass book that the funds would be used to purchase real estate, as compared to his testimony that the funds were used to purchase stock, but the homestead checks with the endorsements constitute mute corroboration for the testimony of plaintiff and her son that he did in fact receive these funds. We have therefore concluded that plaintiff produced sufficient proof to establish the loan and the corresponding liability of the community between defendants.
We come now to a discussion of the claim for $17,995.75 allegedly loaned on May 6, 1969, and the motion to remand.
Dr. Mittelbronn and his mother testified that he was anxious to invest in real estate in St. Tammany Parish and persuaded her to refinance her home with the Globe Homestead Association. She did so and produced in evidence a check issued by the attorneys for the homestead on May 6, 1969, to the order of plaintiff and endorsed by her together with her son. The check shows that it was negotiated at the International City Bank (ICB) on May 8, 1969. It is true that Dr. Mittelbronn's testimony was typically vague and equivocal. At times he insisted that he received cash for the check at the ICB and kept it in the shoe box at his home until he used $10,000.00 in connection with the cash portion of a purchase price he paid to acquire property in the St. Tammany Parish on June 14, 1969. He repeatedly stated that he was unable to recall the details about this transaction and at other times testified that he did not receive all cash at the ICB but also a mixture of cash and cashier's checks. At the continued trial an official of the ICB, in response to a subpoenae duces tecum, testified that a search of the bank's records showed no cashier's checks had been issued to Dr. Mittelbronn during this period. On the first day of the trial plaintiff was put on the witness stand to make a return on a subpoenae duces tecum issued in behalf of Mrs. Mittelbronn, and in connection therewith she did produce the handwritten memoranda and notes, as well as the leases which have previously been discussed. But not until the continued trial did she produce a statement of the notary for the Globe Homestead Association, dated May 6, 1969, prepared in connection with the $17,995.75 loan, on the back of which was a statement handwritten and signed by Dr. Mittelbronn purportedly dated May 7, 1969, promising to pay plaintiff the $17,995.75. She testified that she had searched for all of such documents before the first day of the trial but had overlooked this one.
The foregoing demonstrates why the trial judge was apparently unimpressed with the quality of the proof offered with respect to this alleged debt. The case had been pending for some time before the first day of trial and there was no satisfactory explanation as to why the acknowledgment was not produced from the beginning. The manner in which the acknowledgment of the debt was made is such that *542 it could have been prepared at any time and not necessarily on May 7, 1969, as plaintiff and her son both testified. There was little objective documentary evidence, such as cancelled checks or bank statements to support the claim so that plaintiff's overlooking the supposed acknowledgment at the outset of the trial is difficult to understand. Yet the cancelled check of the homestead notary endorsed by plaintiff and her son should have been afforded some weight and must be reevaluated in the light of matters brought out by plaintiff in her motion to remand.
This motion was filed here on July 30, 1975, shortly after the appeal was lodged. It is supported by an affidavit of plaintiff's counsel to which is attached a transcript of testimony by Mrs. Mittelbronn, taken on February 27, 1973, in the domestic case between the Mittelbronns. Therein the following questions were put to and answers given by Mrs. Mittelbronn:
"Q Mrs. Mittelbronn, Judge Marcus was asking you about any other expenses. Does he have any loans with his mother?
A He did borrow $20,000 from his mother.
Q And that is still owed to his mother?
A I have no idea."
At the trial of the case now before us the following testimony was given by Mrs. Mittelbronn on October 30, 1974, in response to questions by her own counsel, on cross examination by Dr. Mittelbronn who appeared in proper person and cross examination by plaintiff's counsel:
DIRECT EXAMINATION BY MR. TUCKER:
Q Mrs. Mittelbronn, you are the wife of Dr. Mittelbronn who has been testifying, is that right?
A Yes.
Q There has been some testimony in the Record about a shoe box in your closet in the home you and he were living in back in 1968 to 1969, and in which considerable sums of cash money were kept. Did you ever know about such an arrangement?
A No, sir.
Q It was supposed to be one of your shoe boxes. Do you say you didn't know about it?
A No, I did not.
Q So did you ever hear your husband mention it that he had a shoe box in the closet that he was keeping large sums of money in it?
A No, sir.
Q Did you know anything about him borrowing $17,995.75 from his mother?
A No, sir.
Q Did his mother ever give him money?
A Yes, sir, maybe to gotake us or the children I should say out for hamburgers, but for a treat, but that's all I know.
MR. TUCKER:
That's all I have, your Honor.
DR. MITTELBRONN:
Since I'm appearing as my own attorney may I ask the witness a question?
THE COURT:
Yes, you certainly may.
CROSS EXAMINATION BY DR. MITTELBRONN IN PROPER PERSON:
Q I'm not very up to date; I certainly don't know about the law, the court, so please excuse me if I'm extremely uninitiated. This witness has so testified previously in the separation pendente lite that she knew about a twenty thousand *543 dollar debt to Mrs. Jennie B. Gillaspie and she so testified under oath
MR. TUCKER:
Objection.
THE COURT:
Maintained.
BY DR. MITTELBRONN:
Q Do you remember testifying that you knew of a twenty thousand dollar debt owed to Mrs. Jennie B. Gillaspie at a previous hearing for alimony pendente lite?
A No.
DR. MITTELBRONN:
That's all.
RE-CROSS EXAMINATION BY MR. DERBES:
Q Could you have possibly testified to that?
A Not that I remember.
Q You never did know that Mrs. Gillaspie was lending her son money to invest in property in St. Tammany?
A No. For what I have known Mrs. Gillaspie never did have money; she was always poor. Her son had to give her money to help bury his grandmother.
Q And he never told you that he borrowed any money from your mother at any time?
A No. We were pretty well off. He had a private practice and had three or offices. [Sic]
Q At no time he ever told you that the money he was using to buy property in Jefferson Parish was partly advanced by his mother?
A No, sir.
THE COURT:
You mean St. Tammany Parish? Jefferson, also?
MR. DERBES:
I don't know anything about Jefferson.
THE COURT:
Read back what Mr. Derbes said.
(AT THIS TIME LAST QUESTION BY MR. DERBES READ BACK).
THE COURT:
Correct to St. Tammany.
BY MR. DERBES:
Q So all of this suit came as a complete surprise to you?
A I've heard him ask his mother and his mother refused.
Q You have heard him ask his mother for money?
A Yes, and she refused.
Q And where did that happen?
A Oh, golly, I guess the exact year I couldn't really tell you. I guess maybeI've no idea, sir, I couldn't tell you.
Q Where did it happen?
A When we were in our home.
Q If she was so poor, weren't you surprised that he had asked her to loan him money?
A Yes, I was very surprised, sir.
Q But you knew that Mrs. Gillaspie owned her own home?
A Pardon?
Q You knew she owned her own home on Napoleon Avenue?
A Yes, I did.
*544 THE COURT:
We'll break for lunch now and be back for 1:00.
(AT THIS TIME LUNCH RECESS HELD.)
BY MR. DERBES:
Q How did you know that Mrs. Gillaspie had no money, was very poor, what facts did you base that statement on?
A From her statements, her saying so.
Q Like what, what kind of statements did she make?
A Just that she neversomething in particular? Is that what you want? Well, she was never extravagant, never bought oodles of things; she took care of her mother that I knew.
Q Did you know that she got some money from her mother?
A No. Her mother was on welfare.
Q You had no knowledge of your own that Mrs. Gillaspie had sufficient money to lend to your husband?
A I never knew she had money to loan him.
Q You had no facts on which to base your statement that Mrs. Gillaspie was poor and had no money except your testimony except that she wasn't extravagant and took care of her mother, is that right?
A Plus the fact that she was always stating that she was taking care of her mother, that all her salary she had was for her mother who was ill for many years and she had to have someone there to take care of her.
MR. DERBES:
That's all.
MR. TUCKER:
Your Honor, I feel like I have been able to complete my proof.
THE COURT:
Oh, yes, I agree with you on this item.
It is clear that the trial judge afforded much weight to the quoted testimony of Mrs. Mittelbronn in which she flatly contradicted her husband's testimony about her knowledge of the shoe box and plaintiff's loans to her husband. It is equally clear that she flatly contradicted her own testimony given twenty months previously that her husband had borrowed $20,000.00 from his mother. The question is, what would have been the effect on the trial judge's evaluation of Mrs. Mittelbronn's testimony had the previous testimony been placed in evidence? What would have been the effect on the judge's evaluation of plaintiff's case on the $17,995.75 item had the evidence of Mrs. Mittelbronn's previous statement been before him?
Ordinarily a case will not be remanded to allow a party to produce evidence which was available in the first instance. But the peculiar circumstances prevailing here persuade us to remand the case under the authority of LSA-C.C.P. Art. 2164. Plaintiff was not a party to the domestic proceedings. The Mittelbronns were represented by counsel who are not involved in the instant case. In his affidavit plaintiff's counsel recites that the first knowledge he and his client had of Mrs. Mittelbronn's previous testimony was gained when Dr. Mittelbronn asked her about it. He checked the record of the separation proceedings but found no reference to a hearing in February, 1973. He spoke to Dr. Mittelbronn's previous counsel who said that he recalled no testimony previous to July, 1973. Yet, somehow, counsel located the testimony and it is now available to the parties. We conclude that the *545 advantage of insuring that justice is done by having the trial court consider the previous testimony with full opportunity afforded to all parties for examination and cross examination on the point outweighs any disadvantage which may result from further delay in these proceedings. The use of the previous testimony on remand will be confined to its bearing on the issue of the validity of plaintiff's claim for $17,995.75.
Accordingly, the judgment appealed from is affirmed with respect to all claims of plaintiff except those for $2,431.74 and $17,995.75. That portion of the judgment dismissing plaintiff's claim for $2,431.74 is reversed and it is now ordered that there be judgment in favor of plaintiff, Mrs. Jennie Barksdale Gillaspie, and against defendant, Dr. Ernest J. Mittelbronn, as head and master of the community formerly existing between him and Mrs. Mittelbronn, in the full amount of $2,431.74 together with 5% interest from December 3, 1968, until August 12, 1973, and at 7% from August 13, 1973, until paid. That portion of the judgment dismissing plaintiff's claim for $17,995.75 is annulled and, insofar as that claim alone is concerned, the matter is remanded to enable the parties to introduce the transcript of the testimony of Mrs. Joan Rulis Mittelbronn taken on February 27, 1973, in proceedings No. 551-488 of the Civil District Court for the Parish of Orleans, entitled "Mrs. Joan Rulis, wife of Ernest J. Mittelbronn, III vs. Ernest J. Mittelbronn, III," and to be afforded an opportunity to offer evidence with respect thereto. After the hearing on remand the trial judge shall render judgment as to the $17,995.75 claim. Each party to bear his own costs to date; future costs on the sole remaining claim to await a final determination thereof.
Affirmed in part, reversed in part and rendered: annulled and set aside in part and remanded.